Revised May 8, 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

No. 01-50159

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

SIDNA B GEE

Plaintiff-Appellant,

v.

ANTHONY PRINCIPI, Secretary, Department Of Veterans Affairs

Defendant-Appellee.

---------------------------------
Appeal from the United States District Court
for the Western District of Texas
---------------------------------
April 18, 2002

Before EMILIO M. GARZA, BENAVIDES, and STEWART, Circuit Judges.

BENAVIDES, Circuit Judge:

After she was not selected for a new job opening, plaintiff filed this Title VII retaliation claim. The district court granted summary judgment for her employer. For the reasons that follow, we reverse and remand.

I.

Plaintiff Sidna B. Gee ("Gee") was originally employed by the Department of Veterans Affairs ("VA") as a Staff Pharmacist at the VA Medical Center in Waco, Texas. In 1993, she began serving

--1--

as the Clinical Automatic Data Processing Coordinator, where she was responsible for implementing an electronic data processing system for entering and filling pharmacy orders throughout the medical center. Soon thereafter, she began experiencing problems with her supervisor, the acting Chief of Staff, Dr. John J. Bryan ("Dr. Bryan"). When Dr. Bryan passed Gee two inappropriate notes that expressed romantic overtures, she reported the problem to the Director of the Medical Center, Wallace Hopkins ("Hopkins"). Hopkins immediately removed Gee from Dr. Bryan's authority and placed her under his own direct supervision. In addition to this remedial step, Hopkins directed Dr. Bryan to take sexual harassment training and write Gee a note of apology. Gee accepted the apology and expressed her satisfaction with the outcome.

Gee continued to work for two years after the incident, but changes at the department eventually caused some of these tensions to reignite. Although Gee's position was technically a one-year assignment, it was renewable and she remained in it until 1995. During this time, her contact with Dr. Bryan left her with the impression that he was attempting to undermine her work. In February 1995, the title of her job was changed to OE/RR Coordinator. Although Gee did not support the name change, she wrote Hopkins an email stating that she would accept the decision because she was a "team player." Nevertheless, she alleged that "some personality issues" were involved, and charged that Dr. Bryan was trying to have her removed from her position.

In March, the Department of Veterans Affairs announced that the Waco center would become fully integrated with the other medical centers in the area. This change caused a reorganization in the management structure of the Waco center. The reorganization had a profound impact on Gee's position. Sometime prior to April 21, 1995, Hopkins called a meeting to discuss the possibility of moving Gee's OE/RR Coordinator position to the Information Resources Management Division

("IMR"), which oversees computer systems and applications.  The attendees included Hopkins, Dr. Bryan, Rusty Solomon, Lee Gibbs ("Gibbs"), the IMR chief, and Dr. Gary Melvin ("Dr. Melvin"), the Chair of the Informatics Council, of which Gee was a member.  At the meeting, each of the participants made statements about Gee.  Dr. Melvin expressed support for Gee.  Dr. Bryan complained about her inability to get along with others. Hopkins stated his concerns about her liberal use of sick leave.  The general consensus at the end of the meeting was that something different needed to be done with the position.  Shortly thereafter, Hopkins directed Gibbs to prepare a job description for the new position, which was announced on May 24, 1995.  Two people applied for the position, Gee and Debbie Boyd ("Boyd").  Gibbs interviewed both of them and spoke to each candidate's supervisor.  At the conclusion of the process, Gibbs announced that Boyd had been selected for the position.  He explained his decision by stating that although Gee had proficient technical skills, he was concerned about her ability to work effectively with others.

After she was not awarded the job, Gee filed an EEOC complaint against the Waco VA Medical Center.  Following an investigation and hearing, the Administrative Law Judge issued a recommended decision.  Gee then filed suit against Anthony Principi, Secretary of the Department of Veterans Affairs ("the Secretary"), under Title VII.  She claimed that her nonselection was the result of retaliation for her reporting of Dr. Bryan's sexual harassment.  The district court granted the Secretary's motion for summary judgment, holding that Gee had failed to establish a prima facie case of retaliation.  Moreover, it held that even if she could make such a showing, Gee was unable to raise a genuine issue of material fact concerning the falsity of her employer's proffered reason for not giving her the job.  Gee timely filed a notice of appeal from this judgment.

II.

--3--

In Title VII retaliation cases, the plaintiff must first make the following prima facie showing: "(1) that [she] engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002). The causal link required by the third prong of the prima facie case does not rise to the level of a "but for" standard. *Id.* The plaintiff "need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'causal link' element of a prima facie case." *Long v. Eastfield Coll.,* 88 F.3d 300, 305 n.4 (5th Cir. 1996) (citation omitted). "Assuming the plaintiff is able to establish [her] prima facie case, the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001). If the defendant satisfies this burden, the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose. *Id.* At the summary judgment stage, the nonmovant need only point to the existence of a genuine issue of material fact. We review the grant of summary judgment de novo. *Mason v. United Air Lines*, *Inc.*, 274 F.3d 314, 316 (5th Cir. 2001).

A.

The parties agree that Gee has satisfied the first two elements of her prima facie case, i.e., that she engaged in a protected activity and suffered an adverse employment action. We must determine whether Gee is able to raise a fact issue regarding a causal connection between her complaint of sexual harassment and her nonselection for the new position. In granting summary judgment against Gee, the district court noted that the harassment occurred two years prior to her nonselection, and that Gee received a favorable performance review from Hopkins on April 21, 1995, after the meeting

at which Gee claims that her fate was sealed. Moreover, it found no evidence to suggest that Dr. Bryan or Hopkins explicitly directed Gibbs not to select Gee. Finally, it dismissed testimony from Dr. Melvin that it was his impression that by the end of the March meeting, Gibbs had a negative opinion of Gee and the group had decided to look for someone else to fill the position.

Gee relies on *Long v. Eastfield College* in support of her argument that she produced sufficient evidence to meet her prima facie burden on the issue of causation.[1] In *Long,* we reaffirmed the longstanding principle that, in determining whether an adverse employment action was taken as a result of retaliation, our focus is on the final decisionmaker. 88 F.3d at 306-07. The statements and actions of ordinary employees are normally not imputable to the employer. *Id.* at 306; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring in the judgment) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden . . . ."). Nevertheless, when the person conducting the final review serves as the "cat's paw" of those who were acting from retaliatory motives, the causal link between the protected activity and adverse employment action remains intact. *See Long*, 88 F.3d at 307 (quoting *Shager v. Upjohn Co.*, 913 F.3d 398, 405 (7th Cir. 1990)). The ultimate question, therefore, is whether "'the employee can demonstrate that others had influence or

---

[1]Gee's reliance on *Long* is appropriate because, as the dissent notes, the facts in this case are analogous to those in *Long*. In *Long*, we reversed the district court's grant of summary judgment on the plaintiffs' Title VII retaliation claims. *See Long*, 88 F.3d at 309. The plaintiffs had been terminated after violating workplace rules regarding office keys. *See id.* at 304. Although there was no suggestion that the college president, who was the ultimate decisionmaker, harbored any retaliatory animus toward the plaintiffs, the supervisors who recommended termination had previously been reported by the plaintiffs for harassment. *See id* at 304-05. In reversing the district court, we held that based on the evidence a reasonable jury could conclude that, despite the fact that the college president consulted people other than the harassers, his decision was nonetheless influenced by the supervisors' retaliatory motives. *See id.* at 307-08 & n.8.

--5--

leverage over the official decisionmaker.'" *Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2001)).[2] As *Long* instructs, "[t]he degree to which [the final decisionmaker's] decisions were based on his own independent investigation is a question of fact . . . ." 88 F.3d at 307.

Drawing all reasonable inferences in favor of Gee, the nonmovant, we hold that the district court erred in concluding that she had not created a triable fact issue regarding whether Gibbs was influenced by Dr. Bryan or Hopkins.[3] The parties do not dispute that at the crucial meeting, Dr. Bryan and Hopkins both made comments critical of Gee. Dr. Bryan, who had previously harassed Gee, stated to the group that Gee had a problem communicating and getting along well with others. Dr. Bryan's comments at the meeting were vehement enough that Dr. Melvin soon thereafter approached Gee to inquire whether Dr. Bryan had something against her. In addition to Dr. Bryan's derogatory comments, Hopkins, who knew of the harassment, questioned her use of leave time. Furthermore, Dr. Melvin testified that at the end of the meeting, it was his impression that the

---

[2]The dissent contends that "under *Long*, once Gee established that Gibbs was improperly influenced by persons with retaliatory motives, the next question then becomes whether Gibbs conducted an independent investigation." *Infra* at ___. This statement confuses the inquiry under *Long*. The fact issue to be resolved is whether the ultimate decisionmaker conducted an independent investigation or was influenced by the retaliatory animus of those who participated in or knew about the alleged harassment. *See Long, 88* F.3d at 307; *see also Russell*, 235 F.3d at 226 ("If the employee can demonstrate that others had *influence or leverage* over the official decisionmaker . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker.") (emphasis added) (citing *Long*). If the ultimate decisionmaker was influenced by others who had retaliatory motives, then his investigation cannot in any real sense be considered *independent*.

[3]Although Gee's nonselection followed her harassment complaint by nearly two years, this time lapse alone does not entitle the Secretary to summary judgment. We consider time as "part of our analysis, but not in itself conclusive of our det erminations of retaliation." *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992) (affirming finding of retaliation despite passage of fourteen months between protected activity and adverse action). Moreover, in this case, Gee experienced continuing problems with Dr. Bryan even before the final adverse employment action occurred.

decision regarding Gee was already made, and that she would not be selected for the new position. The Secretary discounts this evidence of Dr. Melvin's impression, characterizing it as mere speculation. Even if Dr. Melvin's impression differs from that of other meeting attendees, Gee has clearly met her summary judgment burden by adducing sufficient evidence to enable a factfinder to conclude that Gibbs was improperly influenced by the comments of Dr. Bryan or Hopkins. If so, then even though Gibbs talked to other people after the meeting, including an interview with both candidates, the selection process did not constitute the "independent investigation" required by *Long* and its progeny. The district court therefore should not have granted summary judgment on this issue.[4]

B.

Gee having satisfied her prima facie burden, the Secretary must demonstrate a legitimate nondiscriminatory purpose for Gee's nonselection. The Secretary has satisfied this burden by offering Gibbs' explanation that he selected Boyd because he believed that she would be able to get along well with the physicians, and that he had received some negative feedback on Gee from several of her coworkers. In order to survive summary judgment, therefore, Gee must demonstrate a material issue of disputed fact as to whether the Secretary's proffered explanation was merely a pretext for

_____

[4]The dissent mischaracterizes our opinion as holding that "because Bryan and Wallace Hopkins, who knew of Gee's previous harassment claim, made negative comments to Gibbs at a meeting in which the new employment position was discussed, Gee has established such a causal link." *Infra* at ___. We do not hold that the mere fact that Dr. Bryan and Hopkins made negative statements necessarily precludes summary judgment. The inquiry under *Long* and its progeny is not whether statements were made, but whether those statements *influenced* the final decisionmaker. Our analysis therefore focuses on the testimony of Dr. Melvin, who stated that it was his impression that by the end of the meeting, the negative statements had created a general consensus that Gee would not be selected. In light of this testimony, which the dissent does not even acknowledge, a reasonable factfinder could conclude that Dr. Bryan's and Hopkins' negative comments influenced Gibbs and thereby tainted his investigation.

--7--

retaliation.

Gee contends that Gibbs' explanation for her nonselection has been disingenuous and inconsistent. She points to discrepancies between Gibbs' affidavit given during the investigation and his testimony at the administrative hearing. Specifically, she notes that although he initially denied that he participated in a meeting relating to Gee's position, Gibbs later admitted that he had attended such a meeting. Asked why he did not disclose this fact during the investigation, he responded that he did not know. In addition to this omission, after originally claiming that others were not involved in the selection process, Gibbs later admitted that he conferred with several people. Moreover, although Gibbs at first was unable to recall the substance of the statements made about Gee at the meeting, he later testified that everyone made comments and the general tenor of those comments was unfavorable.

In addition to the discrepancies in Gibbs' own testimony, Gee points to the conflict between Dr. Melvin's recollection that a consensus against Gee was formed at the meeting and the testimony of Dr. Bryan, Hopkins, and Gibbs, who downplayed the significance of the meeting. Furthermore, Gee contends that when she first sought an explanation from Gibbs regarding her nonselection, he was evasive and failed to provide any specific reasons. Finally, she notes that Gibbs' conclusion that she had some problems in communicating and working well with others is contradicted by the glowing review she received in April, when her "excellent communication skills" and flexibility in accommodating others were praised.

The district court acknowledged that Gee's evidence "cast doubt" on the Secretary's proffered reason for Gee's nonselection. It held that summary judgment was appropriate, however, because in addition to proving the falsity of the proffered reason, Gee was required to establish that

she was the victim of retaliation.[5]  We agree that "[t]he ultimate burden of persuading the trier of fact that the defendant [retaliated] against the plaintiff remains at all times with the plaintiff." *Raggs*, 278 F.3d at 468.  We take note, however, of the Supreme Court's explanation that a factfinder may infer the ultimate fact of retaliation from the falsity of the explanation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000).  In such cases, a plaintiff may withstand a motion for summary judgment without adducing additional, independent evidence of retaliation.  This case provides a straightforward application of this standard.  The Secretary has offered a plausible nonretaliatory explanation for Gee's nonselection.  Gee, however, has provided sufficient evidence to cast doubt on this explanation, thereby enabling a reasonable factfinder to conclude that it was false and that the decision not to hire her was already made by the end of the key meeting.  Resolution of this dispute is properly within the province of the trier of fact, and therefore summary judgment was inappropriate.

## III.

For the foregoing reasons, we REVERSE the district court's order granting summary judgment in favor of the Secretary, and REMAND the case for further proceedings.

ENDRECORD

---

[5]Specifically, the district court stated: "Not only must the Plaintiff establish that the Defendant's proffered reason was false, she must also establish that the Defendant retaliated against her." Op. at 10.

EMILIO M. GARZA, Circuit Judge, dissenting:

This Title VII retaliation case requires us to determine if the appellant, Sidna Gee, has made the requisite prima facie showing of causation in order to survive Anthony Principi's motion for summary judgment. Specifically, we must discern whether Gee has established a causal link between her protected conduct in filing a harassment claim against Dr. John Bryan with the Equal Employment Opportunity Commission, and her non-selection for a new employment position at the VA Medical Center where the person charged with filling that position, Lee Gibbs, had no knowledge of Gee's previous harassment claims. The majority essentially contends that because Bryan and Wallace Hopkins, who knew of Gee's previous harassment claim, made negative comments to Gibbs at a meeting in which the new employment position was discussed, Gee has established such a causal link.

In contrast to the majority, I believe that although Gibbs, the ultimate decision maker, may have received information allegedly tainted by impermissible retaliatory motives, his subsequent independent investigation severed the connection between Bryan's and Hopkins' retaliatory animus and his ultimate decision not to appoint Gee to the new position. I agree with the district court's conclusion that a reasonable jury could not have found that Gibbs was merely Bryan's or Hopkins' "cat's paw," or that the review process was a sham or conduit for their alleged retaliatory motives. Instead, the evidence establishes that Gibbs conducted a full and thorough review before reaching his decision not to appoint Gee to the new position.

As the majority points out, we have previously considered retaliation cases in which the person with the retaliatory motive is distinct from the person making the adverse employment decision. *Long v. Eastfield College*, 88 F.3d 300 (5th Cir. 1996). In *Long*, two supervisors, who had

--10--

previously had sexual discrimination charges filed against them, recommended that two of their female employees, who had filed the complaints, be terminated for illegally duplicating several keys. The supervisors submitted their recommendations to the president of the college, who made the final termination decision. We held that, in order to survive summary judgment, the plaintiffs had to create a genuine issue of material fact as to whether the ultimate decision maker exercised independent judgment in reaching his decision. We stated: "If [the president] based his decision on his own independent investigation, the causal link between [the supervisors'] allegedly retaliatory intent and [the employees'] terminations would be broken." *Id.* at 307. We went on to say, however, that "[i]f, on the other hand, [the president] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [the supervisors], the causal link between [the employees'] protected activities and their subsequent terminations would remain intact." *Id.*

The facts of this case are analogous to those in *Long*. As in *Long*, Gibbs was not motivated by impermissible retaliatory motives. Gee presented evidence, however, that both Bryan and Hopkins allegedly recommended that Gibbs not appoint Gee to the new position.[6] Given these facts, the majority, without any further analysis, simply concludes that Gee has established a causal link between Bryan's and Hopkins' alleged retaliatory actions and Gee's non-selection.

The majority's conclusion conflicts with our decision in *Long*. *Long* stands for the proposition that a decision maker who is improperly influenced can nevertheless purge the taint of retaliatory motives by conducting a subsequent independent investigation. Thus, under *Long*, once

---

[6]Principi argues that Bryan and Hopkins had no retaliatory motive at all, focusing on the fact that the original sexual harassment complaint occurred two years earlier. Viewing the facts in the light most favorable to Gee, we should presume that such animus continued to exist. Nevertheless, because Gibbs conducted his own independent investigation, the causal connection between Bryan's and Hopkins' impermissible retaliatory motives and the adverse employment action was severed.

Gee established that Gibbs was improperly influenced by persons with retaliatory motives, the question then becomes whether Gibbs conducted an independent investigation.

Here, even though Gibbs may have received negative recommendations from Bryan and Hopkins, Gibb's independent investigation severed the causal nexus between the statements and Gee's non-selection for the position. Gee acknowledges and the majority concedes that Gibbs consulted with the candidates' supervisors. Gibbs also spoke with several employees within his own department and who had worked closely with Gee. Gibbs also interviewed both Gee and Linda Boyd, the candidate who ultimately obtained the position. Based on this information, Gibbs concluded that Gee was a good employee, but often absent for a variety of reasons. Thus, he decided that Gee was not the most qualified candidate for a position which apparently placed a premium on daily interaction with other employees. Gibbs further testified that although he took into account the recommendations made by all of the people he spoke with, the decision to hire Boyd was his own. Given this uncontested evidence, no reasonable jury could find that Gibbs merely "rubber stamped" the reco mmendations of Hopkins and Bryan. As such, Gee has failed to establish her prima facie case.

For the foregoing reasons, I would AFFIRM the judgment of the district court.