# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 24, 2008

Charles R. Fulbruge III
Clerk

No. 07-50888
Summary Calendar

PAT LAND,

                              Plaintiff-Appellee,

v.

RICHARD DIETZ, In His Official and Individual Capacities;
DALE CHILDERS, In His Official and Individual Capacities,

                              Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Texas
No. 7:06-CV-99

Before REAVLEY, SMITH, and BARKSDALE, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Richard Dietz and Dale Childers appeal the denial of their motion for sum-

mary judgment on the basis of qualified immunity. Because we lack jurisdiction,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

we dismiss the appeal and remand for further proceedings.

## I.

Pat Land began working for the Odessa Fire Department in 1980. At the time of his termination, he held the rank of Senior Captain. In late 2004, the Ector County Health Department alerted Childers, an Assistant Fire Chief, that close to 100 students had come down with rashes, nausea, vomiting, and respiratory problems at Barbara Jordan Elementary School in the Ector County Independent School District. Numerous public health officials, including Land, were called in to investigate.

Land served as the incident commander. Along with an expert retained by the school district, the fire department's Haz-Mat crew tested for toxic substances. The tests indicated a high level of acetone in the areas where the majority of affected students had class. Further testing, after the rooms had been aired out, also showed a positive result, albeit at a lower level. The final test, taken after more extensive airing out of the school, did not detect acetone.

Land and the school district's expert, Mark Graves, recommended that the school remain closed, because they could not rule out acetone as a cause of the health problems. Childers instructed Land not to talk to the media about the test results.

On December 5, Childers and others involved in the response had a meeting to evaluate the findings, decide what to tell the parents, and determine whether to open the school. The group decided to inform the parents that all tests were negative, which they communicated in a press release. The school district superintendent decided to reopen the school the next day.

Students continued to experience health problems. For example, a "Health Update" for February 17, 2005, reported that forty-four students had come down with what had become known as the "Jordan Rash." Because Land worked for

the fire department and had a child at the school, parents asked him for information regarding the investigation. Pursuant to Childers's instruction, however, Land kept silent.

The school district and other officials decided to hold two informational meetings with parents on January 12 and 13. Land attended the January 12 meeting, at which Childers told the parents that all the tests were negative. To communicate his disagreement with the story being told to parents, Land walked out of the meeting.

After the meeting, Land went to talk to Childers to ask why the officials had decided to tell the parents, falsely, that the test results were negative. Land went so far as to accuse Childers of lying to the parents. Childers became upset and said he did not appreciate Land's questioning his integrity. Childers spoke to Dietz, who testified that Childers was upset and thought Land was being disrespectful. Land also visited with Dietz about his concern that Childers had lied to the parents.

On February 20, Land was working at his business. He testified that over the course of the evening he drank four beers and ate snacks but did not feel drunk or tipsy. Around 7:00 p.m., he took several prescription medications, including Neurotin and Cymbalta for neuropathy. He remembers leaving to go home around 8:00 p.m. Later that night, a DPS trooper found him parked in his truck on the side of the road and arrested him for driving while intoxicated ("DWI").

Land immediately reported his arrest to his superiors, in accordance with Fire Department policy. Dietz testified that Land told him that he thought his impairment had resulted from the interaction between his medications and the alcohol. Assistant Fire Chief Roger Boyd told Land not to worry about it, because he was not the first fire fighter to whom this had happened. Childers told him, "There's no rule that says there's like any kind of automatic termination,

I can tell you that. That's all I know."

The department began conducting an investigation into the DWI. Land's physician sent two letters explaining the possible side effects of the combination of alcohol and prescriptions. Childers admits that he knew nothing about Cymbalta, did not contact Land's physician, and was not particularly interested in whether a drug/alcohol interaction might have caused Land's impairment. He also testified that Land's case was the first in which he had watched the videotape of a fire fighter's arrest for DWI. Childers and Dietz went to view the videotape together.

Childers nevertheless prepared a report for Dietz in which he recommended Land be terminated. Childers testified that he spoke to Dietz concerning his recommendation. Boyd also spoke to Dietz and recommended less severe sanctions. Dietz testified that he does not remember talking to either.

Following the investigation, Dietz terminated Land but thereafter meted out a much milder punishment to another fire fighter who had been cited for DWI. In December 2005, the DWI charges against Land were dropped.

Land sued Dietz and Childers pursuant to 42 U.S.C. § 1983, asserting retaliatory termination based on speech protected by the First Amendment. Specifically, Land alleged that the defendants had discharged him in retaliation for his behavior surrounding the health problems at the school. Land and Dietz unsuccessfully moved for summary judgment based on qualified immunity.

II.

Our jurisdiction extends only to "final decisions" of district courts. See 28 U.S.C. § 1291 (2000). The denial of summary judgment is not ordinarily a "final decision," but qualified immunity presents a special case. To the extent that a denial of summary judgment on the issue of qualified immunity turns on questions of law, we may review it on interlocutory appeal. Connelly v. Tex. Dep't of

4

Criminal Justice, 484 F.3d 343, 345 (5th Cir. 2007). If, however, the defendant makes a factual, rather than legal, sufficiency claim, we must dismiss the appeal for want of jurisdiction. Id.

Our jurisdiction is properly invoked only insofar as we are asked to determine whether "the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." Kinney v. Weaver, 367 F.3d 337, 348 (5th Cir. 2004) (en banc). Where factual disputes exist, we accept the plaintiff's version.

On appeal, we determine only whether Dietz and Childers are entitled to qualified immunity as a matter of law, and there are only two legal questions we address: (1) whether the plaintiff has alleged a violation of a constitutional right and (2) whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident. Connelly, 484 F.3d at 346. (citing McClendon v. City of Columbia, 305 F.3d 314, 322-23 (5th Cir. 2002)). We dismiss any appeal that relies on arguments not addressed to either of these issues.

## A.

A claim of First Amendment retaliation has four elements: (1) The plaintiff suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated the defendant's conduct. Kinney, 367 F.3d at 356. Childers contends that Land has not stated a First Amendment violation as to him, because the only evidence in the record demonstrates that his role was limited to conducting an investigation, and he did not cause the adverse action. In other words, Childers alleges that Land cannot satisfy the fourth element as to him.

The district court did not articulate specific facts upon which it based its

decision as to Childers. Where a district court "fails to set forth the factual disputes that preclude granting summary judgment, we may be required to review the record in order to determine what facts the district court, in the light most favorable to the nonmoving party, likely assumed." Id., at 348 (internal quotations and citations omitted).

In the employment context, the actions of ordinary, non-supervisory employees are not typically a basis for a claim. Gee v. Principi, 289 F.3d 342, 346 (5th Cir. 2002). An exception is where the decision-maker functions as the ordinary employee's "cat's paw" such that the adverse employment decision could fairly be attributed to the employee. Id.

The district court denied Childers's motion and determined that there were genuine issues of material fact because Childers (1) prepared the recommendation that was accepted, even though it was disputed by other subordinates; (2) had a special relationship with Dietz as evidenced by his going along with Dietz to view a videotape of Land's DWI arrest; (3) discounted Land's attempt to explain his incapacity for medical reasons; and (4) was angry with Land for his protected speech. These facts support the notion that Dietz may have been Childers's "cat's paw."

Accordingly, this case falls into the exception, and Land's case may proceed against Childers. Defendants, for purposes of their appeal, have conceded that Land's speech involved a matter of public concern. The remaining elements turn not on a legal question but on factual ones. The defendants therefore have conceded that Land has alleged a violation of a constitutional right.

## B.

The second question we may address is whether defendants' conduct was objectively reasonable in light of clearly established law. Public employers may escape liability if they prove that they would have taken the same adverse em-

ployment action regardless of the protected conduct. Gonzales v. Dallas County, 249 F.3d 406, 412 (5th Cir. 2001). This is not a back door to our usual refusal to reevaluate the district court's factual determination; the only question is whether defendants acted in an objectively reasonable manner, with respect to the constitutional rights, notwithstanding the factual disputes. Id.

Defendants urge that their behavior was objectively reasonable, because the city and fire department had policies that allowed for termination in light of Land's DWI. Land counters by noting that no one else had been terminated pursuant to that policy and that he was terminated for his speech. There are genuine issues of fact as to whether the termination was objectively reasonable, because at root it depends on defendants' motives. Because defendants' argument goes to the genuineness of Land's factual assertions rather than to their materiality, we may not consider this argument. Connelly, 484 F.3d at 347.

The appeal is DISMISSED, and this matter is REMANDED. We express no view on the ultimate decision on the merits or on precisely how the district court should proceed on remand.